Your Honors, I would like you to look at the whole picture here. This man, Mr. Asif Javed, is married to a U.S. citizen who has petitioned for him. He is eligible to adjust status should the case be remanded, even though he came in with – he was not admitted legally. He – she petitioned for him in time for him to qualify by paying a fee of $1,000 to the Department of Homeland Security. He's also eligible for a B visa, which he could get at the consulate. However, he's afraid to go back to Pakistan. In addition, he's recently suffered a heart attack and cannot travel, cannot go back to Pakistan. His I-130 petition was approved in – on March 17th, 2000. Is all of that what you just told us in the record? These are things which are – have been – there was a motion to reopen, which was denied. We filed a motion to reopen based on the marriage. It was denied. The – I don't remember. What you just – what you just related to us, I don't recall reading when I read this. Well, see, because the wife in – on August 4th naturalized, just a month ago. Just recently. Right. So you're just updating us with the current state of the – Yes, exactly. All right. On March 16th, 2004, we received a letter from the Department of State that he could apply for a V visa in Pakistan. Apparently, they hadn't – well, she hadn't become a citizen yet, so he was still eligible for a V visa, which is available to someone who's married to a lawful permanent resident. But now she's a citizen, so if the case gets remanded to the judge in immigration proceedings eventually, he can adjust status based on that marriage. Now – Why didn't you just talk to the government and see if they'd be willing to stipulate to a remand? I have. They can't. They can't? Right now, not today. They can't. But I'm just bringing it to your attention. I mean, we've spoken to them. I mean, they say they won't or they can't today. So far, they've said they won't. Maybe they'll change their minds, but thus far, they won't. Why not? Why not save everybody all the trouble? That's what I'm suggesting, Your Honor. That seems to be the logical conclusion of this case. Well, there's not – logical conclusions have little to do with immigration cases. No. The – I assume you'll pursue whatever you pursue with the government about whether they should agree to a remand for that purpose. But there's not much we can do about that, is there? Well, I want you to look at another factor. If Mr. Javed is removed from the United States and his wife has an approved petition for him, his only method of coming back is a 212 waiver, which it takes at least two to three years before the service even looks at it, even picks it up off the shelf, so that he's looking at between maybe 5 and 10 years in reality before he comes back to this country. Let's not worry – I mean, let's not speculate for the moment about what might happen down the line. Why don't you tell us, if you might, why we should not uphold or, you know, agree with I.J.'s credibility finding here and on the merits? Well, I think the judge went way outside the normal bounds of his discretionary powers. He basically dismissed Mr. Javed's testimony early on. Even his characterization of his demeanor. He says halting and quivering. Well, quivering doesn't mean that he's untruthful. He's afraid. And quivering is kind of a normal response to being in that type of situation where you're responding to questions from an authoritarian figure about things that you've suffered. He testified pretty consistently to several events which the judge said even if he believed him, he wouldn't think that that would be enough for asylum. And those events were pretty severe. Mr. Javed was tortured. He was put in a room. Someone had a drill, threatened to put that drill to his head. He was beaten severely, and all on account of his political opinion. The judge also found that in Pakistan, these two groups, the political factions that were fighting with each other, were like combatants. And therefore, since they disagreed, they were like enemy combatants in a war. And you can't grant asylum to enemy combatants in a war. Well, that's really outside the range of immigration law. Political parties are definitely what they are, political parties. And if one person is a member of one political party and is persecuted because of his membership, that's a ground for political asylum. The judge totally discounts that, even if he found him credible in his decision, in his written decision. So I think that if he was found credible, he absolutely must be granted asylum and as a backup must be granted Convention Against Torture, because the country reports totally and completely corroborate this murderous situation that is going on between the two parties and between other factions. And the impunity which the police force has in Pakistan and the collaboration between various criminals in Pakistan and the police force. And Mr. Javed became a victim of this whole situation. So his testimony has to be taken into account, at least with the requirements of the Convention Against Torture, pursuant to Comaltas. And the judge never made a significant even preliminary analysis of his eligibility for the requirements of Convention Against Torture. He merely didn't believe him. And he didn't believe him. He made up his mind not to believe him during the first few minutes of that testimony and characterized the whole thing. He cites various events taking place where he met his wife in Pakistan, whether it was at a cafe or a hotel, whether Mr. Javed remembered the name of the cafe or not or exactly what street the hotel was on or the name of the hotel. These are all totally irrelevant to what is the heart of the claim. The heart of the claim is he was a member of one party. That party was at war politically, not in an actual war, but politically with another party. The other party wanted Mr. Javed to join them. When he didn't, they tortured him. It's a very simple case. It's not a complex case. He should have been granted asylum. If the Court decides to remand it, he'll be able to adjust status. Thank you. May it please the Court. Good morning. My name is Arthur Rand. I want to spend much time on this. If he were able now to apply for adjustment of status, is that automatic or is that something discretionary? It would be discretionary, Your Honor, especially in light of the proceedings going today. I mean, what happens is he has to, first of all, obtain a visa, and that should be pretty automatic because his wife is a naturalized citizen. I don't know any of this, Your Honors. I just found out all this information this morning from counsel literally 30 minutes ago. So as far as saying anything that would bind my client, I cannot do so because I have not consulted with my client. As far as what the proceedings might hypothetically be, at that point, he would have to move to reopen his proceedings here in front of the BIA to say, I am now eligible for relief. However, if the Court does uphold his asylum denial and does uphold the removal order, then he will not be eligible for to be barred, subject to a waiver, as counsel implied, he may be able to get. So that's where we stand as far as, hypothetically speaking, the proceedings. And hypothetically speaking, the government could agree to a remand to the board so he could apply for asylum. Absolutely, Your Honor, we could. I'd have to consult my client about that, though. We could defer this for a couple of weeks to let you ask. But I was trying to find out about the mechanics of it. If they made a motion to reopen and established what counsel tells us, then his status would be adjusted? Yes, Your Honor. At that point, his proceedings would be reopened. His status would be adjusted. He would be eligible for a visa, subject to eligibility. I'm not sure. You know, I don't know any of these facts. If his life was naturalized, then the visa would be automatically available. Is there any bar to his, to their just now moving to reopen? He may be out of time. I, you know, usually the time limits are pretty stringent. However, the board itself has sua sponte reopening powers, based on the merits of the case, as well as if the district counsel joins in the motion to reopen, that's another way to go about it. All right. How long would you suggest that we defer a submission for so that they can explore this? I would say at least two, three weeks, Your Honor. Maybe we'll give you 30 days. Thirty days would be just right, Your Honor. Does Your Honor wish for me to continue? Yes. Now let's talk about the implicit. Okay. Well, Your Honor, the major, the key issue in this case is credibility. Yes. The immigration judge spent pages and pages and pages going over his credibility And just, I'm not going to go over each and every one of those. But I highlighted just a few. One deals with just the demeanor and the manner of testifying that the IJ noted repeatedly, despite warning after warning after warning, saying that, you know, to the respondent, I'm sorry, to the petitioner in this case, that if he continued to be unresponsive to questions, that is, if he continued to, when he's asked a direct question, to relate something completely unrelated, to testify about something unrelated, then that would be held against him. However, as we noted in our brief, and I can point those out, the petitioner continued to do that, and he was once again stopped by the immigration judge and told, no, no, no, that's not what you were asked. You were asked this question. Please answer the question. Also, the immigration judge found that the petitioner, in conjunction to doing this, he was also taking an inordinate amount of time to answer some questions, as far as the immigration judge is concerned. He found that the petitioner thought about it for a lengthy period of time, and then he found the petitioner would say something that was unrelated to the question. He found that he took an adverse credibility finding based on that one element. Moving on to some of the discrepancies in the testimony, a very, very big significant omission was made by the petitioner. In his testimony, for the very first time, the petitioner brought up the fact that he said, well, my ice factory was destroyed by this opposing party, this MQH. I belong to MQA. They belong to MQH. The parties split into those two groups. And the judge turned and said, well, how do you explain the fact that you omitted this completely from your asylum application, which you prepared with the assistance of counsel? And he said, well, I wasn't sure. I did not know I needed to be that specific. And the immigration judge found that that was not credible. The explanation was not credible. And that's supported by the record, because this is a college-educated man. He's also a fairly ‑‑ he's an older man. He's ‑‑ Our cases say you don't ‑‑ our cases would tend to support that, that you don't have to be that detailed in your ‑‑ But you're not sure. ‑‑ in your asylum application. Absolutely. And as to dates or as to something other, you know, a minor fact, I would absolutely agree with you, Your Honor. But this is a man that only has three claims. There's only three incidents that he is basing his asylum claim on, the ice factory incident, the kidnapping, and then this allegedly false murder charge against a police officer that he says was raised against him. But I thought economic deprivation wasn't generally viewed as a basis for granting asylum. So the destruction of his factory, that's just destruction of property, and it wouldn't necessarily rise to the level of persecution, whereas the other two things do. So it could just as well be that it wasn't something that they thought would be a ground for asylum in the application. Well, that may be the explanation, Your Honor, but that was not one that was offered to the immigration judge in those kind of post‑talk explanations. Right, but I'm saying how is it relevant to the persecution claim? That's, I mean, not even ‑‑ Because he testified about it as a basis for persecution. He said, I was being forced, compelled to join this other party. And they talked to me and they warned me and they said, hey, look, you need to join us. And then to give him a lesson, they destroyed his factory. As a matter of law, though, does destroying business or property rise to the level of persecution? It may, Your Honor, if it's in conjunction to other factors, which he says there were. That is, the continuing threats against him. So, you know, this was just a manifestation, he said, of these threats. Well, the immigration judge found the fact that he omitted this entire claim from his asylum application to be incredible. Also, moving on, he was testifying that he flew from the airport, saying that he had no problems leaving Karachi Airport, the main, the international airport in Karachi. And yet the immigration judge found a big discrepancy there. He said, well, look, if you had a murder charge outstanding against you against a police officer, how is it that you weren't able to leave? And he said, well, they must have not updated their records or something. Yet the State Department report specifically states that the authorities maintain records of wanted criminals at the airports for the specific reason that they don't want them to leave and that they update it regularly. So does the United States. We're not very good at it either. Our watch list at the airport. Well, Your Honor, that was, you know, I don't know. I'm just saying this is what the facts of record show. And as to whether or not the finding is supported by the record, I'm saying that it is,  So, you know, as far as is there a cogent reason to give deference to the findings of the immigration judge, I'm saying there is. Next, he repeatedly denied that the fashion that he belonged to was a violent fashion. He was saying, no, we are not violent. Yet the State Department report refutes that specifically. And he was asked about that, saying, look, the State Department report says that your fashion and their fashion repeatedly. People tend to think that they're peace loving people, whether they commit aggression or not. That's just a question of judgment. You might ask American officials what they think of our policy. And it might be different from what some administrative agency in another country would think of it. People tend to think they're well-motivated and behave well, whether they do or not. I mean, I didn't make it a lie. It just makes it as a view. He thinks his faction is just they're the wonderful, peaceful people. Probably the other faction would tell you the same thing and tell you his. And we look at them and we think they're both violent. Well, you're right. He's asked if the faction, his faction is violent. That is, do they promote violence against the opposing faction? And he'd probably tell you we only do it in self-defense. He never said that. No, but that's why he thinks they're not violent. We don't know that, Your Honor. He could have used that. He said we're not violent, but that means we're not the aggressors. We're not violent. We just defend ourselves. He doesn't have to say that. Well, you're right. It doesn't seem to me that that kind of an individual personal judgment about how your group should be characterized constitutes the kind of false testimony that makes your story of why you're being persecuted unbelievable. Again, Your Honor, I'm out of time. I'll just end with I would just fall back on the standard review here. That is, if the record does provide reasons. What do you think is the strongest example of all the many that you have of why it's proper to find his testimony not credible? Well, there are many reasons. The omission, the complete omission is one. The fact that he said that he got through the report with a murder charge outstanding is another. The fact that he said the MQMH is in league with the police, and yet with this warrant that's outstanding against him, he says he's being kidnapped by the MQH, and yet they release him without a problem. Yet if they're in league, if they're in cahoots together, how is it the MQH releases him? Those are problematic. Those are just unbelievable facts, and the immigration judge found them to be problematic. I think there's, of course, questions. I'll just rest on my break. Thank you. Maybe we won't have to decide this case because the government will try and keep the family together. Yes, Your Honor. That's up to my client, Your Honor. I cannot make representations. And stipulate that you have this case remanded back to the board. Yes, Your Honor. I will go back and I will apply support of whatever the client says. Maybe counsel can provide you with all the documentation that you need as soon as possible. I would appreciate that. Any assistance we can get from counsel would be great. Thank you very much. Thank you. There's time rules with motions to reopen to the board. We filed one when, before she became a citizen, because we needed to file it. It was still too late. But he wasn't eligible for adjustment then with the court because she wasn't a citizen yet, the wife. Now it's later. So the only way that the board will reopen is either sui sponte, as counsel suggested, or if the government stipulates, which are both not the usual procedure. And so that's why I'm suggesting that this Court remand it for any number of reasons. I think your strongest reason to remand it is he was tortured and will be tortured again. And that whole rationale and analysis was never addressed by the court, never, never, never touched by the court. I submit, Your Honor. Thank you. Case to target will be submitted. It will be deferred. Submission will be deferred for 30 days. The next case for oral argument is Gregorian v. Ashcroft.
judges: Reinhardt, Wardlaw, Paez